**UNITED STATES of America,**
**Plaintiff,**

v.

**Jean Carlos RIVERA–MORALES,**
**Defendant.**

**CRIMINAL NO. 15–070 (FAB)**

United States District Court,
D. Puerto Rico.

Signed October 26, 2015

Elba I. Gorbea–Padro, United States Attorney's Office, San Juan, PR, for Plaintiff.

Eric A. Vos, Hector L. Ramos–Vega, Federal Public Defender's Office, Hato Rey, PR, for Defendant.

## REPORT AND RECOMMENDATION

CAMILLE L. VELEZ–RIVE, UNITED STATES MAGISTRATE JUDGE

On January 21, 2015, defendant Jean Carlos Rivera–Morales ("Rivera–Morales") was charged by a Grand Jury in a One Count Indictment for production of child pornography, to wit, producing a video with a cellular phone of a six (6) year old prepubescent female minor (Defendant's biological daughter) engaged in sexually explicit conduct, that is, the minor masturbating Defendant Rivera–Morales, in viola-

tion of Title 18, *United States Code,* Section 2251(b). (Docket No. 10).

On March 17, 2015, Defendant Rivera–Morales filed a "Motion to Suppress" claiming he had a significant and legitimate expectation of privacy in his cellular phone and, therefore, a search warrant supported by probable cause needed to be obtained.[1] However, he claims to have a "good faith believe" that the state and federal agents searched the contents of Defendant's cellular phone without obtaining a search warrant, which they could have easily obtained, and prior to obtaining his consent. Defendant also claims the consent Defendant provided to search his cellular phone was after the search. Moreover, Defendant posits his wife Beskis Sánchez–Martínez ("Ms. Sánchez–Martínez") did not have authority to consent to the search of his cellular phone, inasmuch as it belonged exclusively to him. Thus, Defendant avers his rights under the Fourth Amendment were violated, and the suppression of the video and any other evidence, such as verbal and written statements that are fruits of the poisonous tree, is warranted. (Docket No. 19).

On April 10, 2015, the Government filed its Response to Defendant's request to suppress arguing that Defendant's Fourth Amendment rights were not violated because the Government did not search his cellular phone prior to Defendant giving his consent. The Government also implies that Defendant's wife had authority to show the contents of Defendant's cellular phone because she had access to some of his applications in his cellular phone. Thus, since there was no search of the cellular phone within the meaning of the Fourth Amendment, suppression is not warranted. (Docket No. 23).

On April 14, 2015, Defendant Rivera–Morales filed a Reply to the Government's Response challenging each of the Government's arguments. (Docket No. 24).

Both parties agreed a suppression hearing was necessary inasmuch as there were factual issues in controversy. The suppression hearings were held on May 28, 2015 and June 8, 2015. The Government presented the testimonies of PRPO Aileen Pérez–Ramos ("Officer Pérez–Ramos"), Ms. Sánchez–Martínez and HSI SA Pablo Llabre ("Agent Llabre"). (Docket Nos. 29 and 30). Several exhibits from both parties were introduced into evidence. (Docket No. 31). The defense did not present any testimonial evidence at the suppression hearings.

At the conclusion of the suppression hearing, defense counsel requested the transcripts of the suppression hearings in order to file a post-hearing motion. The oral request was granted. Once the transcripts were filed, Defendant was granted thirty (30) days to file his brief and the Government was granted thirty (30) days, thereafter, to file its reply brief. (Docket No. 30).

On July 29, 2015, the transcripts for the suppression hearings were filed. (Docket Nos. 36 and 37).

On August 28, 2015, Defendant filed his "Post–Hearing Supplemental Memorandum to Defendant's Motion to Suppress." Defendant summarized the testimonies heard during the suppression hearings and argued there were some inconsistencies which diminished the credibility of the witnesses. In addition, Defendant explained his wife was acting as a Government agent when she allegedly voluntarily showed the video to the agents. Defendant also posits

---

1. Defendant relies on *Riley v. California,* —— U.S. ——, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430 (2014) for the proposition that officers must generally secure a warrant before searching a cell phone.

his wife did not have authority to consent to the search of his cellular phone because it belonged exclusively to him. Defendant asserts that, even accepting that the initial search by Defendant's wife was conducted by a private party, the additional interventions of the agents without a warrant exceeded the scope of a private search. Thus, what may have started as a private search turned into one in which Defendant's wife helped the Government to prosecute him, and infringed his rights under the Fourth Amendment. (Docket No. 38).

After requesting an extension of time, the Government filed is "Response to Defendant's Supplemental Memorandum" arguing that Defendant failed to make a showing that Ms. Sánchez–Martínez was acting as an agent of the Government at the time she found the video in Defendant's cellular phone. Thus, the Government asserts Ms. Sánchez–Martínez acted as a private person and not as an agent of the Government. (Docket No. 41).

After careful consideration, it is recommended that Defendant Rivera–Morales' Motion to Suppress be DENIED.

### SUMMARIES OF THE TESTIMONIES AT THE SUPPRESSION HEARINGS [2]

#### A. PRPO Aileen Pérez–Ramos.

Officer Pérez–Ramos testified on direct examination that she works for the Sexual Crimes Division of the Criminal Investigations Corp in Humacao. (Transcript of Suppression Hearing, May 28, 2015, Docket No. 36, at p. 4.). She has worked as a PRPD officer for 24 years and in the sex crimes division for 7 years. (*Id.*). The duties of Officer Pérez–Ramos include in-

vestigating sexual crimes, mistreatment of minors and institutional mistreatment. (*Id.*).

On January 6, 2015, Officer Pérez–Ramos was on duty. However, she was at her home on sick leave. (*Id.* at pp. 4–5). That day, she received a phone call at around 8:00 or 8:15 am from one Sergeant Pérez, that there was a case that would be referred to the Las Piedras police station. (*Id.* at p. 5). Officer Pérez–Ramos went to the Las Piedras police station to interview the complainant, Ms. Sánchez–Martínez. (*Id.*).

During the interview, Officer Pérez–Ramos testified that Ms. Sánchez–Martínez was very upset and that she began to explain how on the night before, January 5, 2015, she accessed her husband's cellular phone and found a video and a photograph of her daughter's hands touching the penis of her husband, Defendant Rivera–Morales. (*Id.* at p. 6). According to Officer Pérez–Ramos, Ms. Sánchez–Martínez said that she would show the agent the video because she was "really angry." (*Id.* at pp. 6–7). Ms. Sánchez–Martínez pulled out her husband's phone from her purse [3], opened it and turned it on, and immediately showed the video to Officer Pérez–Ramos. (*Id.* at p. 7). After seeing the video, Officer Pérez–Ramos instructed Ms. Sánchez–Martínez to turn off the video, which she described as depicting a male penis with small hands making up and down movements. (*Id.* at p. 8). Officer Pérez–Ramos testified she was not shown anything else from the phone, that she seized it, and that she would be consulting the case with ICE. (*Id.*). Officer Pérez–Ramos made out a receipt for the

---

**2.** These summaries are mainly taken from Defendant Rivera–Morales' Post–Hearing Supplemental Memorandum to Defendant's Motion to Suppress due to their accuracy. (Docket No. 38, pp. 3–11).

**3.** Exhibit 1 is a photograph of the iPhone cellular phone of Defendant.

phone, placed it in a manila envelope and took it with her to her house because she was sick. (*Id.* at p. 9). Officer Pérez–Ramos summoned Ms. Sánchez–Martínez to the Humacao police station the next day.

The following day, January 7, 2015, Ms. Sánchez–Martínez arrived at the Humacao police station in the morning and brought with her other equipment belonging to her husband including a laptop computer, a hard disk, a USB and a charger, among other things. (*Id.* at pp. 9–10). By then, Officer Pérez–Ramos had already called ICE. (*Id.* at p. 10). She dealt with and consulted with an ICE Agent by the first name of Pedro LNU. She did not remember the ICE agent's last name. (*Id.*). The ICE agent informed he would come to the police station and he did. (*Id.*). At the police station, Officer Pérez–Ramos explained the case to the ICE agent and turned over the phone and the other equipment. (*Id.* at p. 11). Office Pérez–Ramos also contacted the Humacao District Attorney's office and she, Ms. Sánchez–Martínez and the ICE agent went to meet the local prosecutors. (*Id.*)

At the local prosecutors office, Ms. Sánchez–Martínez was interviewed in the presence of the ICE agent and Officer Pérez–Ramos. They were eventually joined by two more agents from HSI, agent Pablo Llabre and Sandra LNU. (*Id.* at p. 12). According to Officer Pérez–Ramos, during the interview, Ms. Sánchez–Martínez stated that she wanted to show the video to the prosecutors. (*Id.*). The local prosecutors and the HSI agents saw the video which was shown by Ms. Sánchez–Martínez. (*Id.*). Nothing else was shown from the phone to the agents or the prosecutors as per the testimony of Officer Pérez–Ramos. (*Id.* at p. 13). Offi-

cer Pérez–Ramos testified that "[n]o one touched that phone. It was only Ms. Beskis [Sánchez–Martínez] who showed the video and that was that." (*Id.*).

After this showing of the video, the phone was turned off and returned to the ICE agent by the first name of Pedro LNU. (*Id.*). Agent Pérez–Ramos returned to the Humacao police station because defendant Mr. Rivera–Morales had arrived pursuant to a summons which had been issued to him at the Las Piedras Police station after he had gone there the day before to turn himself in. (*Id.*). Officer Pérez–Ramos read Mr. Rivera–Morales his rights. Officer Pérez–Ramos asked him whether he understood his rights and he answered in the affirmative.[4] Officer Pérez–Ramos then interviewed Mr. Rivera–Morales and he only said was that he acted wrongly and he should not have. (*Id.* p. 14). HSI agents subsequently interviewed Mr. Rivera–Morales and he made admissions regarding the production of the video at issue. (*Id.* at pp. 16–17). The minor was also interviewed. (*Id.* at p. 17). The cellular phone and other electronic equipment remained under the custody of the HSI agents during this process. (*Id.* at 18). According to Officer Pérez–Ramos, she did not review anything else from the electronic equipment except the video which was shown to her by Ms. Sánchez–Martínez. (*Id.*). Officer Pérez–Ramos claimed she does not know how to use that type of cellular phone. (*Id.*).

On cross-examination, Officer Pérez–Ramos stated that Ms. Sánchez–Martínez insisted on showing the video after the officer told her to put back the phone. (*Id.* at p. 20). Officer Pérez–Ramos once again admitted that she took the phone to her home and she did not see anything else in

---

4. Exhibit 2 is the PRPD advice of legal rights and warnings provided to Defendant and dated January 7, 2015 at 12:55 pm. The signa- tures of Officer Pérez–Ramos and of Defendant appear in the document.

the phone. (*Id.* at p. 22). Additionally, Officer Pérez–Ramos testified that she has never seen the General Order by the police superintendent issued on August 27, 2014. (Defense Exhibit C). (*Id.* at p. 27). She also used different PPR–126 forms: the old form for one seizure and the correct form for the other. (See Exhibits A and B). (*Id.* at pp. 27–28). She testified that both forms can be used. (*Id.* at 28). Officer Pérez–Ramos explained that "as long as it does not lead to corporal injury", it is part of the normal protocol for a police officer to take evidence to his/her home. (*Id.* at p. 30). When asked what kind of cellular phone did she have, Officer Pérez–Ramos stated she has a Samsung, which uses the Android operative system. (*Id.* at p. 33). Officer Pérez–Ramos testified she did not show the video to anyone and she did not seek a search warrant on January 6 or 7, 2015 for the phone.

### B. Ms. Sánchez–Martínez.

The Government next called to the stand Ms. Sánchez–Martínez, the wife of Defendant Rivera–Morales, whom she identified in Court. (Transcript of June 8, 2015, Docket No. 37 at p. 4). She testified as to how she discovered the video at issue in this case on January 5, 2015. That night, at around 10:30 pm, she took the cellular phone of Rivera–Morales to unblock some parts of a game she was playing on her own phone. (*Id.* at p. 5). She then saw a photo of her husband's penis, with blurry hands and woke him up to ask him about it. (*Id.* at pp. 5–6). Rivera–Morales gave his wife an explanation that did not satisfy her, so she later on once again took the cellular phone and found both a photo and a video. (*Id.* at p. 6). She described the video as depicting her daughter masturbating her husband. (*Id.*). She became angry and upset, began confronting and hitting Rivera–Morales. She kept the phone and threw her husband out of the house. Subsequently, she woke up her

children and drove to her mother' in law's residence, where she showed the video to the parents of Rivera–Morales. (*Id.* at 8). This was around midnight. (*Id.* at p. 9). Thereafter, Ms. Sánchez–Martínez went to her mother's house and told her about the video. (*Id.* at p. 10). She also showed the video to her uncle who is a municipal police officer. (*Id.*): Her uncle advised her on the procedure to file a complaint. (*Id.* at p. 11). She followed the advice and went to the Humacao police station where she showed the video to two desk officers. She was summoned for the next day to meet with agent Aileen Pérez. (*Id.*).

The next day, January 6, 2015, Ms. Sánchez–Martínez met with Officer Pérez–Ramos at the Las Piedras police station. (*Id.* at p. 12). She and her daughter were interviewed by Pérez–Ramos and she voluntarily showed the video. (*Id.*). Ms. Sánchez–Martínez then turned the phone off and gave it to Officer Pérez–Ramos. Officer Pérez–Ramos gave her a receipt for the phone. (*Id.*).

On January 7th, 2015, Ms. Sánchez–Martínez was summoned back to the Humacao police station where she delivered additional equipment belonging to Rivera–Morales before proceeding to the Humacao District Attorney's office to be interviewed. (*Id.* at pp. 13–14). There, she was once again interviewed. She explained what happened and requested the cellular phone to show it voluntarily to the people present. (*Id.* at p. 15). Ms. Sánchez–Martínez then turned the phone off and delivered it back to the agents. She testified that in all of the times that she showed it, the video was the only thing that she showed from the cell phone. (*Id.* at pp. 15–16). Ms. Sánchez–Martínez also said that, when she met with Officer Pérez–Ramos, the phone was always with her. (*Id.* at p. 16). Nothing else happened in relation to the cellular phone and she kept

it at all times until she delivered it to Agent Llabre at the local DA's office. (*Id.*). At the conclusion of her direct testimony, Ms. Sánchez–Martínez added that she and her husband had a family plan for her and his cell phones and the plan included accounts and phone numbers for two other persons. (Exhibit 3). (*Id.* at p. 19). She also said she frequently used her husband's cell phone as it did not have a password. (*Id.* at p. 20.).

On cross examination, Ms. Sánchez–Martínez admitted that, when she or her husband left the house, they would take their own phones, not the other person's phone. (*Id.* at p. 22). Additionally, in her cell phone she had her own personal contacts, applications, social media, photos and emails. (*Id.*). She even had her own Apple identification that requires a password when prompted. (*Id.* at p. 23). Likewise, she admitted that Rivera–Morales had his own contacts, applications, emails, social media, photos and videos. (*Id.* at p. 24). When someone wanted to reach Rivera–Morales, they would call his number, not the number of Ms. Sánchez–Martínez. The converse was true when someone wanted to reach her. (*Id.*).

In regards to the interview she attended to at the Humacao prosecutor's office, Ms. Sánchez–Martínez stated on cross examination that it was Officer Pérez–Ramos who had the cellular phone. (*Id.* at p. 30). When asked whether during the interview in which she again voluntarily showed the video "any agent or prosecutor had the phone in his or her hands", Ms. Sánchez–Martínez answered in the negative. (*Id.* at p. 31).

Finally, on re-direct examination, Ms. Sánchez–Martínez related that she saw Officer Pérez–Ramos give the cellular phone to HSI Agent Pedro LNU, and that the latter placed it in a Glad bag. (*Id.* at 35).

### C. HSI Special Agent Pablo LLabre.

Agent Llabre testified he is a special agent with HSI ICE assigned to the child exploitation investigation group. (*Id.* at p. 36). On January 7, 2015, his unit received a phone call from the Humacao PRPD station that a person possibly had engaged in production of child pornography. (*Id.* at p. 37). He and a fellow agent, Sandra Sánchez, responded to the Humacao District Attorney's office. (*Id.*). Once there, they encountered fellow HSI Agent Pedro Román. (*Id.*). SA Llabre received the details of the case from Officer Pérez–Ramos and eventually was shown a video contained inside the iPhone 5 cell phone. (*Id.*). The preliminary information Agent Llabre received was that they had a video showing the suspect, Defendant Rivera–Morales, engaged in sexually explicit conduct with his daughter. (*Id.* at p. 38–39). The cellular phone was under the custody of Agent Pedro Román in a manila envelope according to Agent Llabre. (*Id.* at p. 39). SA Llabre continued to testify that during Ms. Sánchez–Martínez' interview, she showed them the video. (*Id.* at p. 39). Agent Román gave the phone to Officer Pérez–Ramos who in turn gave it to Ms. Sánchez–Martínez. (*Id.* at p. 40). Ms. Sánchez–Martínez then accessed the video and gave the phone back to Officer Pérez–Ramos. (*Id.*). All persons present saw the video from the hands of Officer Pérez–Ramos. (*Id.*). Agent Llabre also conducted interviews of Ms. Sánchez–Martínez and the minor. (*Id.*)

Subsequently, Agent Llabre interviewed Defendant Rivera–Morales. (*Id.* at p. 42). Agent Llabre read the Miranda warnings to Defendant (Exhibit 4) and was able to obtain a full confession from him. (*Id.* at pp. 42–43). Agent Llabre also related, during his direct testimony, that he was able to obtain written consent (Exhibit 5) from Rivera–Morales to search his cellular

phone and electronic equipment. (*Id.* at pp. 44–45). Agent Llabre testified that, aside from the video that was shown to him, he did not see anything else from the cellular phone. (*Id.* at p. 45).

Finally, as to the agent's prior testimony at the preliminary hearing and using the transcript of said hearing (Exhibit 6), SA Llabre explained that when he said—answering questions from defense counsel—that he reviewed the cellular phone that contained the video, he meant that he looked at the video that was shown to him. (*Id.* at p. 47). SA Llabre did not look at anything else. When asked to explain what he meant when he said at the preliminary hearing that he was shown the contents of the cell phone, Agent Llabre clarified at the time he saw the video, Officer Pérez–Ramos had the phone in her hand. (*Id.* at p. 48). He further clarified that what he meant by "contents of the phone" during the preliminary hearing was simply the video and nothing else.

On cross examination, Agent Llabre indicated that, at the interview of Ms. Sánchez–Martínez at the local prosecutor's office, she expressed that she wanted to show the video. (*Id.* at p. 56). The cellular phone went from Officer Román to Officer Pérez–Ramos, then to Ms. Sánchez–Martínez who accessed the video, gave it back to Officer Pérez–Ramos, who held the phone in her hand while everyone looked at the video. (*Id.* at pp. 56–57). Agent Llabre was asked about the fact that both Ms. Sánchez–Martínez and Officer Pérez–Ramos had testified that it was Ms. Sánchez–Martínez who had the phone in her hand at all times. Agent Llabre stated that he did not recall that.[5] (*Id.* at p. 57). Agent Llabre also conceded that he did not ask Ms. Sánchez–Martínez to sign a consent form in order to access the phone. (*Id.* at p. 62). SA Llabre admitted

that his initial thought was to obtain a warrant for the cellular phone. (*Id.*). The cellular phone was eventually submitted to a forensic examination based on the consent forms signed by Defendant Rivera–Morales. (*Id.* at p. 63). A report of said forensic examination was produced. (*Id.*).

A review of the report (Exhibit E) shows the cellular phone was personalized for Defendant Rivera–Morales. For instance, the apple identification for the phone was underJean_RM20@hotmail.com. (Exhibit E). The last back up computer name is Jean-pc. The last back-up computer name is JEAN–PC. Item 24 titled owner's name indicates Jean's Iphone. (Exhibit E). The Sync host name is JEAN–PC. (Exhibit E). According to Agent Llabre, based on his investigation, there was no doubt in his mind that the cellular phone analyzed belonged to Defendant Rivera–Morales. (Transcript of June 8 hearing, Docket No. 37, at p. 65).

## LEGAL DISCUSSION

### A. Search—Private or Governmental.

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched. *Minnesota v. Olson*, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The inquiry involves a two-part test: first, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that expectation "is one that society is prepared to

---

5. Agent Llabre, as case agent, was present at the suppression hearing when both Officer

Pérez–Ramos and Ms. Sánchez–Martínez testified.

recognize as objectively reasonable." *United States v. Battle,* 637 F.3d 44, 48–49 (1st Cir.2011); *United States v. Rheault,* 561 F.3d 55, 59 (1st Cir.2009) (*citing Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).

In *Riley,* the Supreme Court held that the "search incident to lawful arrest" exception to the warrant requirement does not permit law enforcement to search the contents of an arrestee's cell phone without a warrant. *Riley,* 134 S.Ct. at 2485. In doing so, the Court first found that the governmental interests justifying the "search incident to lawful arrest" exception—protecting officer safety and preventing destruction of evidence—do not apply to the contents of a cell phone because "[d]igital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer," *Id.* at 2485, and officers can prevent both the defendant and third parties from deleting any information from the cell phone, *Id.* at 2486–88. The Court then analyzed a defendant's privacy interests in the contents of a cell phone compared to other objects that might be found in an arrestee's pockets, finding that the pervasive nature of personal information found on a cellular phone dwarfed "the privacy concerns ... implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 2488–89. Because a defendant's privacy interests in the contents of a cell phone are so great, and the governmental interests in a warrantless search of cell phones are relatively weak, the Court found that cell phones cannot be searched incident to arrest without a warrant.

The Fourth Amendment's protection against unreasonable searches and seizures applies only to Government action and not "to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (*quoting Walter v. United States,* 447 U.S. 649, 662, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980)); *United States v. Silva,* 554 F.3d 13, 18 (1st Cir. 2009). If, on the other hand, a private citizen is acting as an agent of the Government the Fourth Amendment's protection against warrantless searches is activated.

The private search doctrine is based on the well-established principle that the Fourth Amendment and its antecedent case law-derived search and seizure rules do not apply to searches conducted by private parties. *Jacobsen,* 466 U.S. 109, 113–14, 104 S.Ct. 1652, 80 L.Ed.2d 85. As such, once a private party has conducted a search, any objectively reasonable expectation of privacy a person may have had in the material searched is frustrated with respect to a subsequent Government search of the same material.[6]

One of the limits on the private search doctrine pertains to the scope of any subsequent Government search. The Government may not exceed the scope of the search by the private party, including expansion of the search into a general search. *Jacobsen,* 466 U.S. at 115, 117–18, 104 S.Ct. 1652. This rule is based on the theory behind the private search doctrine. Once the "frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmen-

---

**6.** *See United States v. Reister,* 44 M.J. 409, 415–16 (C.A.A.F.1996) (concluding that the Government was not restrained from using information obtained from a private party's search of the appellant's logbook and notes because the original expectation of privacy was frustrated); *United States v. Portt,* 21 M.J. 333, 334 (C.M.A.1986) (upholding Government's warrantless search of an unlocked locker as valid where private party had already searched contents); *United States v. Wicks,* 73 M.J. 93, 100 (C.A.A.F.2014) (same).

tal use of the now-nonprivate information" unless the Government uses information for which the expectation of privacy has not already been frustrated. *Id.* at 117, 104 S.Ct. 1652. Thus, the "additional invasions of respondents' privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115, 104 S.Ct. 1652.

▇ Applying this to modern computerized devices like cell phones, the scope of the private search can be measured by what the private actor *actually* viewed as opposed to what the private actor had access to view. *See generally* Orin S. Kerr, Searches and Seizures in a Digital World, 119 Harv. L.Rev. 531, 548, 556–57 (2005).

▇ The Court of Appeals for the First Circuit has identified the following three factors as potentially relevant in deciding whether a private party acts as a Government agent: "the extent of the Government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the Government or to serve its own interests." *Silva,* 554 F.3d at 18 (*quoting United States v. Pervaz,* 118 F.3d 1, 6 (1st Cir.1997)); *United States v. Momoh,* 427 F.3d 137, 141 (1st Cir.2005); *United States v. D'Andrea,* 648 F.3d 1, 10 (1st Cir.2011).

▇ Turning to the instant case, Defendant Rivera–Morales argues that Ms. Sánchez–Martínez was acting as a Government agent when she searched his cellular phone. Therefore, he contends, the search of his cellular phone is to be regarded as having been conducted by the Government for purposes of enforcing the criminal law and, thus, was subject to the requirements of the Fourth Amendment. The Government in turn argues that Ms. Sánchez–Martínez was acting as a private citizen and not as an agent of the Government when she initially saw the video. As such, the search that she conducted of Defendant's cellular phone did not violate the Fourth Amendment.

Taking into account the three factors established by the Court of Appeals for the First Circuit, the court has to be determine whether Ms. Sánchez–Martínez, Defendant's wife, acted as a Government agent when she searched Defendant's cellular phone. The Court finds that Defendant's wife acted as a private citizen. Moreover, the subsequent search (which was limited to the agents viewing the same video Ms. Sánchez–Martínez had already seen and which was voluntarily shown to them by her) did not exceed the scope of the original search. Ms. Sánchez–Martínez was acting in a private, rather than governmental, capacity. As such, the search was a private search that does not implicate the Fourth Amendment.

First, it is undisputed that Ms. Sánchez–Martínez was not a confidential source of the Government but a private citizen. No evidence to the contrary was provided to the court. As ruled by this District before, the fact that Defendant's wife was not a confidential source militates against she being considered a Government agent.[7]

---

7. In *United States v. Burgos–Montes,* 2011 WL 1743420 (D.P.R.2011), this Court noted that in most cases where courts have found that a private citizen was not acting as an agent of the Government, the private citizen has not been a contracted confidential source. The court summarized the following pertinent case law which is incorporated herein: In *Silva* the private citizen was Silva's own brother, who was also a victim of his fraudulent shenanigans and performed the search with the intent of clearing his name. *Silva,* 554 F.3d 19. In *Pervaz* the private citizens were employees of a telephone company who took it upon themselves to use a tracking device to pinpoint the location of Pervaz, who

Second, as to the first two *Silva* factors, there is no evidence the Government had any role in instigating or participating in the original search or that ir exercised any control over the search. Pursuant to the evidence presented at the suppression hearing, it is uncontested that the circumstances under which Ms. Sánchez–Martínez found the video of her husband in Defendant's cellular phone (which is object of the suppression) happened in a private setting late at night in their room in their house. At that time, the Government did not have *any* role in instigating or participating in the search, and had *no* intent or degree of control over the search and the private party.

As to the third *Silva* factor, Ms. Sánchez–Martínez testified that, when she searched her husband's phone, it was for a private interest, that being, to unblock some parts of a game she was playing on her own phone. It was then that she saw a photo of her husband's penis with blurry hands and a video and woke him up to ask him about it. Hence, her aim was not primarily to help the Government, but to serve her own interests.

Having applied the *Silva* factors, we conclude that Ms. Sánchez–Martínez was acting as a private person and not as a Government agent. Thus, the search she conducted of Defendant's cellular phone at their house did not violate the Fourth Amendment.

However, our inquiry does not end here. We now need to determine whether the follow-up search, without a warrant by the agents, which followed the heels of the private search, remained within the scope of Ms. Sánchez–Martínez' original search or whether it exceeded the scope of the private search. *Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85. We find that the scope of the agents' follow-up search of Defendant's cellular phone did not exceed that of his wife's private search.

Where a private party, acting on his or her own, searches a closed container, a subsequent warrantless search of the same container by Government officials does not further burden the owner's already frustrated expectation of privacy. *Jacobsen*, 466 U.S. 109, 117, 104 S.Ct. 1652, 80 L.Ed.2d 85. Moreover, where an expectation of privacy in an item has been effectively destroyed by a private search, police do not violate the Fourth Amendment by examining the same item more thoroughly or with greater intensity so long as they do not "significantly expand" upon or "change the nature" of the underlying private search. *Id.*

We evaluate "[t]he reasonableness of an official invasion of the citizen's privacy ... on the basis of the facts as they existed at the time that invasion occurred." *Jacobsen*, 466 U.S. at 115, 104 S.Ct. 1652. Under the private search doc-

---

was stealing cell phone signals. *See also United States v. Méndez–de Jesús*, 85 F.3d 1 (1st Cir.1996) (private citizens who picked up and took illegal aliens to a police station were not agents of the Government); *Momoh*, 427 F.3d at 140 (employee of a shipping company who opened a package was not an agent of the Government); *United States v. Steiger*, 318 F.3d 1039 (11th Cir.2003) (hacker and amateur pedophile hunter from Turkey who provided anonymous information via e-mail

to the police in Alabama was not an agent of the Government); *United States v. Jarrett*, 338 F.3d 339 (4th Cir.2003); (same anonymous hacker from Steiger who provided information regarding another pedophile's online activities seven months after last contact with the Government was not its agent); *United States v. Malbrough*, 922 F.2d 458 (8th Cir. 1990) (private citizen who was told by police to participate in drug purchases but instead searched a trailer was not an agent of the Government).

trine, the critical measures of whether a governmental search exceeds the scope of the private search that preceded it are how much information the Government stands to gain when it re-examines the evidence and, relatedly, how certain it is regarding what it will find. *Id.* at 119–20, 104 S.Ct. 1652 (finding the DEA agent's search permissible because "there was a virtual certainty that nothing else of significance was in the package[.] ... The advantage the Government gained thereby was merely avoiding the risk of a flaw in the employees' recollection, rather than in further infringing respondents' privacy."); *see also Id.* at 117, 104 S.Ct. 1652 ("This standard follows from the analysis applicable when private parties reveal other kinds of private information to the authorities.... The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated.").

Pursuant to the evidence presented at the suppression hearing, and after assessing credibility, both Agent Pérez and SA Llabre were consistent in the fact that they only viewed from Defendant's cellular phone the exact same video Ms. Sánchez–Martínez had seen before at their house (object of the suppression) and no other contents of the cell phone. This action was "within the scope" of the original search inasmuch as the agents confirmed what they were told by Ms. Sánchez–Martínez, that is, the existence of a video depicting her daughter masturbating her husband. Moreover, when the agents viewed the video in Defendant's cellular phone, it was Ms. Sánchez–Martínez who turned the cellular on, accessed the video and showed the video to the agents.[8] Ms. Sánchez–Martínez voluntarily showed the video to them without any direction or encouragement from the agents. The agents did not manipulate the cellular phone and did not access any of its contents. Thus, their warrantless search did not significantly expand the private search which as originally conducted by Ms. Sánchez–Martínez which only involved the video and a photograph. No other private information was revealed to the authorities. No evidence was presented by the defense that other matters and/or files were accessed in the cellular phone. As a matter of fact, no evidence was presented that the agents directed Ms. Sánchez–Morales to access other files, videos and/or photographs from Defendant's cellular phone. Thus, pursuant to the evidence presented at the suppression hearing, there is virtual certainty that the officer's review was limited to the images that the wife had viewed. This case presents and after-the-fact confirmation of a private search. *See United States v. Lichtenberger,* 786 F.3d 478 (6th Cir.2015).

Furthermore, Defendant Rivera–Morales' expectation of privacy had already been frustrated when his wife found the video in his cellular phone which he kept in their room without any password and readily accessible to his wife.

Defendant Rivera–Morales relies on *Lichtenberger,* 786 F.3d at 478 to support his

<hr>

8. There is an inconsistency inasmuch as Ms. Sánchez–Martínez and officer Pérez–Ramos testified it was Ms. Sánchez–Martínez who held the cellular phone when the video was shown to the agents and SA Llabre testified it was officer Pérez–Ramos who held the cellular phone. This inconsistency, as to who was holding the cellular phone, is inconsequential to our conclusion. All the witnesses were consistent in testifying that it was Ms. Sánchez–Martínez who turned the cellular phone on and she was the one who accessed the video which was shown to the agents. Thus, the agents did not access, physically search or manipulate the cellular phone looking for the video. Defendant's privacy was not compromised.

contention that, even conceding that his wife's search was a private search, the additional invasions of Defendant's privacy by the Government agents exceeded the scope of the private search and violated the Fourth Amendment. (Docket No. 38, pp. 16–19). The facts in *Lichtenberger* are distinguishable from the facts of this case. In *Lichtenberger,* the Sixth Circuit ruled that the Police officer's warrantless search of defendant's laptop computer exceeded the scope of defendant's girlfriend's search of the laptop conducted earlier that day, which was protected by the private search doctrine, and thus, the officer's search was not protected by the Fourth Amendment. After defendant's girlfriend called the police and told them of the child pornography images she found, the officer directed the girlfriend to access the laptop and open the files, but there was no virtual certainty that the officer's review was limited to the images that the girlfriend had viewed, since child pornography images were found in multiple folders that were labeled with numbers, the girlfriend was unsure of which folders she previously opened, and the laptop stored numerous other documents, and other information. These facts are distinguishable from the instant case inasmuch as Ms. Sánchez–Martínez emphatically testified she only showed the agents one video which is the one object of the suppression request. The agents were consistent and corroborated her testimony, since they both testified that they only saw the exact same

video Ms. Sánchez–Martínez had seen as part of the earlier private search and no other contents of the cellular phone [9]. At no time did the agents manipulate Defendant's phone. Thus, by refraining from doing so, and in allowing Ms. Sánchez–Martínez to voluntarily access the video, they had virtual certainty that the search of Defendant's cellular phone was going to reveal only what Ms. Sánchez–Martínez had already seen and told them about. Furthermore, Officer Pérez–Ramos testified she did not show the video to any one else while the phone was under her custody. SA Llabre similarly testified that no one else saw the video in his presence. No other data was extracted from the phone at that time. No credible evidence to the contrary was provided to the Court.

Defendant Rivera–Morales also relies on *Riley,* —— U.S. ——, 134 S.Ct. at 2473, 189 L.Ed.2d 430, for the proposition that officers must generally secure a warrant before searching a cell phone. In *Riley,* the Supreme Court recognized that a mechanical application of its prior precedents would support the search of the cell phone. 134 S.Ct. at 2484. Moreover, *Riley* maintained that in some circumstances there might be a sufficiently strong Government interest to justify a warrantless search of cell phone messages (for example, to see whether confederates of the arrestee might be headed to the scene). *Id.* at 2485–86.

---

9. Defense counsel tried to impeach SA Llabre's testimony at the preliminary hearing using the transcript of the hearing. (Exhibit 6). SA Llabre explained that when he said— answering questions from defense counsel— that he reviewed the cellular phone that contained the video, he meant that he looked at the video that was shown to him. (*Id.* at p. 47). SA Llabre did not look at anything else. When asked to explain what he meant when he said at the preliminary hearing that he was shown the contents of the cell phone, Agent

Llabre clarified at the time he saw the video, Officer Pérez–Ramos had the phone in her hand. (*Id.* at p. 48). He further clarified that what he meant by "contents of the phone" during the preliminary hearing was simply the video and nothing else. We find the clarification made by SA Llabre, at the suppression hearing, to be a reasonable explanation consistent with the testimonies of Officer Pérez–Ramos and Ms. Sánchez–Martínez. As such, his credibility was not diminished.

Although we agree that Officer Pérez–Ramos' taking of the cellular phone to her house overnight and the agents' subsequent viewing of the video in the cellular phone without a warrant in this case was not the best practice after the *Riley* decision, there was no objectively unreasonable conduct in this case for which suppression would be an appropriate remedy, inasmuch as the follow-up search in this case by the agents did not exceed the original private search, as above explained. Moreover, while *Riley* concerned the "search incident to lawful arrest" exception to the warrant requirement, Defendant Rivera–Morales' cellular phone was searched without a warrant based on the private search doctrine and not incident to a lawful arrest. Any search was conducted prior to Defendant's arrest. As such, the Court's holding in *Riley* does not govern the instant case.[10]

In light of the above, we conclude that the original search in this case was a private search and the subsequent search by the agents without a warrant did not exceed the original search. Thus, it is recommended that Defendant's motion to suppress under these grounds be DENIED.[11]

### B. Valid Consent for Subsequent Forensic Search of Cellular Phone and other Electronic Equipment.

Defendant Rivera–Morales admits that it is undisputed that the agents sought and received his consent to search his cellular phone and other electronic equipment. Defendant concedes that, if the consent was validly obtained, Defendant's argu-

ment would fail. (Docket No. 19, p. 10). Thus, our inquiry is to determine whether Defendant Rivera–Morales' consent to search his cellular phone and other electronic equipment was valid.

■ Proof of valid consent to search requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. *United States v. Marshall*, 348 F.3d 281 (1st Cir.2003).

■ A warrantless search does not offend the Fourth Amendment when it is properly circumscribed and stands on a voluntary consent given by a person so authorized. *United States v. Chaney*, 647 F.3d 401, 405–06 (1st Cir.2011). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.'" *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir.2001) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). In determining voluntariness, the focus is often on whether the individual's will has been overborne and his capacity for self-determination critically impaired. *See Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041; *United States v. Calderón*, 77 F.3d 6, 9 (1st Cir.1996).

■ Determining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances, rather than on a mechanical application of legal factors to a factual

---

**10.** Defendant Rivera–Morales concedes that *Riley* involved a search incident to a lawful arrest which is different to his case. However, he claims that does not mean that the reasoning of *Riley* is not extensive to his case. Defendant did not provide any case law on point in support of his contention that *Riley* should apply to this case even though it was not a search incident to an arrest. (Docket

No. 24, p. 6). Whether the *Riley* ruling will be extended to searches which are not incident to a lawful arrest is yet to be seen inasmuch as it is a recent case.

**11.** In light of this conclusion, we need not address whether or not Ms. Sánchez–Martínez had the authority to consent to the search of Defendant's cellular phone.

scenario. *See United States v. Brake,* 666 F.3d 800, 806 (1st Cir.2011) *United States v. Vanvliet,* 542 F.3d 259, 264 (1st Cir. 2008); *Marshall,* 348 F.3d at 286. The common list of relevant fact drives for assessing whether consent was voluntary includes the person's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." *Chaney,* 647 F.3d at 407 (internal quotation marks omitted); *see Vanvliet,* 542 F.3d at 264 n. 2 (listing range of pertinent factors). While "there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it," valid consent requires "more than mere acquiescence in the face of an unfounded claim of present lawful authority." *United States v. Pérez–Montañez,* 202 F.3d 434, 438 (1st Cir.2000) (*citing Schneckloth,* 412 U.S. at 234, 93 S.Ct. 2041 and *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see also Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Chaney,* 647 F.3d at 407–08; *Vanvliet,* 542 F.3d at 264. Further considerations include whether the party was advised of his constitutional rights or whether the consent was obtained by coercive means. *United States v. Dunbar,* 553 F.3d 48, 57 (1st Cir.2009).

 Turning to the instant case, Officer Pérez–Ramos testified that on January 7, 2015 she returned to the Humacao police station because defendant Mr. Rivera–Morales had arrived pursuant to a summons which had been issued to him at the Las Piedras Police station after he had gone there the day before to turn himself in. (Transcript of Suppression Hearing, May 28, 2015, Docket No. 36, at p. 13). Officer Pérez–Ramos read Mr. Rivera–Morales his rights. Officer Pérez–Ramos asked him whether he understood his rights and he answered in the affirmative.[12] Officer Pérez–Ramos 12 then interviewed Mr. Rivera–Morales and he only said was that he acted wrongly and he should not have. (*Id.* p. 14).

On the same vein, Agent Llabre testified that he subsequently interviewed Defendant Rivera–Morales. (Transcript of Suppression Hearing, June 8, 2015, Docket No. 37 at p. 42). Agent Llabre read the Miranda warnings to Defendant (Exhibit 4) and was able to obtain a full confession from him. (*Id.* at pp. 42–43). Defendant initialed every paragraph of the Miranda Warnings (Exhibit 4) and his name and signature appears at the bottom of the form. Agent Llabre also related that he was able to obtain written consent (Exhibit 5) from Rivera–Morales to search his cellular phone and electronic equipment. The consent form was used to perform the forensic analysis of the electronic equipment. (*Id.* at pp. 44–45). The consent form (Exhibit 5) has Defendant's signature, the date and the time. Agent Llabre also explained that the forensic analysis of Defendant's phone and other electronic equipment happened after he received the consent from Defendant and after he had seen the video. (*Id.* at p. 63).

Officer Pérez–Ramos' testimony that she provided Defendant with his rights, he knowingly waived them and then made a voluntary statement is uncontested. Similarly, SA Llabre's testimony that Defendant was advised of his constitutional rights, knowingly waived them, and voluntarily signed a consent to search prior to being interviewed is uncontested. As a matter of fact, SA Llabre's testimony is corroborated by the consent to search form (Exhibit 5), which was signed by

---

12. Exhibit 2 is the PRPD advice of legal rights and warnings provided to Defendant and dated January 7, 2015 at 12:55 pm. The signatures of Officer Pérez–Ramos and of Defendant appear on the document.

Defendant, which states the following: "[t]his written permission is being given by me to the above Agents voluntarily, without promises or threats being made."

No assertions of threats, coercion, physical force, mistreatment, depravation of essentials or otherwise were mentioned in the motion to suppress or presented at the suppression hearing. No evidence was introduced either showing the agents displayed or brandished their weapons. Nor was there any show of force. Defendant Rivera–Morales has not argued he lacked the mental capacity to understand his rights. No evidence was presented either of any debilitating mental illness or that Defendant was under the influence of any medication or controlled substance which may have limited his capacity to understand. As such, there is no issue of voluntariness or coercion to elucidate and the credibility as to whether the statements were or not made would rest on the trier of fact. *See United States v. Tibolt,* 72 F.3d 965, 972 (1st Cir.1995) (noting that factual findings and credibility determinations relating to suppression issues are normally for the trier of fact).

Defendant Rivera–Morales had the opportunity to present evidence in support of his request to suppress and to challenge the Government's evidence and he failed to do so. Defendant Rivera–Morales did not take the stand at the suppression hearing either nor did he present any witnesses on his behalf. As such, Defendant Rivera–Morales has not rebutted the evidence presented by the Government at the suppression hearing before this Magistrate Judge, which shows that Defendant's consent to search his cellular phone and other electronic equipment and his confession were obtained **after** Defendant Rivera–Morales was provided with the Miranda warnings and he voluntarily waived his rights. Since the forensic analysis of the cellular phone and the other electronic equipment and his statements were done, after the consent form to search was voluntarily signed and after knowingly waiving his rights, it is recommended that Defendant's request to suppress his statements and the evidence obtained, after he signed the consent to search, be DENIED.

Finally, we address Defendant's argument that the consent to search was done by him after the warrantless follow-up search of his cellular phone by the agents had taken place and, as such, the search was invalid. Pursuant to the evidence presented at the suppression hearing, it is undisputed that the consent to search was given by Defendant after the warrantless follow-up search of his cellular phone was done. However, Defendant's argument falls because we already determined that the initial search of the cellular phone done by Defendant's wife and the subsequent warrantless follow-up search by the agents were valid searches under the private search doctrine.

## CONCLUSION

In view of the foregoing, it is recommended that Defendant Rivera–Morales' "Motion to Suppress" be DENIED. (Docket No. 19).

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation. *See also,* Amended Local Rules. Failure to file same within the specified time waives the right to appeal this order. *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986) and *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 991 (1st Cir.1988).