# United States Court of Appeals
## For the First Circuit

No. 17-1258

UNITED STATES OF AMERICA,

Appellee,

v.

JEAN CARLOS RIVERA-MORALES,
a/k/a CARLI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Barron, Circuit Judges.

Eleonora C. Marranzini, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, and Vivianne M. Marrero, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 29, 2020

**SELYA**, **Circuit Judge**. The warrant requirement of the Fourth Amendment is among the most important of the constitutional protections enumerated in the Bill of Rights. Even so, not all government intrusions into seemingly private areas, whether physical or virtual, trigger the warrant requirement. One such type of intrusion, seldom encountered, is embodied in the private search doctrine. In general terms, that doctrine provides that law enforcement officers may, without a warrant, examine evidence that a private party has unearthed and made available to them, as long as their actions remain within the scope of the antecedent private search. See United States v. Jacobsen, 466 U.S. 109, 115, 118-20 (1984); United States v. Powell, 925 F.3d 1, 5 (1st Cir.), cert. denied, 139 S. Ct. 616 (2018).

This appeal requires us to apply the private search doctrine in the evolving context of modern technology. At a granular level, it concerns a wife's search of a cellphone belonging to her husband (defendant-appellant Jean Carlos Rivera-Morales), leading to her discovery of a disturbing video. The wife then brought the cellphone to the authorities and directed their attention to the video. Her actions paved the way for the defendant's indictment on a charge of production of child pornography. After the district court denied the defendant's motion to suppress the video, see United States v. Rivera-Morales,

- 2 -

166 F. Supp. 3d 154, 170 (D.P.R. 2015),[1] a jury found him guilty as charged.

The defendant now appeals. After careful consideration, we affirm the district court's denial of the motion to suppress under the private search doctrine and, thus, affirm his conviction. We also affirm the defendant's sentence.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case. With respect to suppression, our account gives credence to the facts supportably found by the district court. See United States v. Coombs, 857 F.3d 439, 443 (1st Cir. 2017). As to the assignments of sentencing error, we draw the facts from the trial record, the undisputed portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing. See United States v. Flete-Garcia, 925 F.3d 17, 21-22 (1st Cir.), cert. denied, 140 S. Ct. 388 (2019).

On the evening of January 5, 2015, the defendant and his then-wife, Beskis Sánchez-Martínez (Sánchez), were at home. Sánchez used the defendant's cellphone, an Apple iPhone, to unblock a part of a game that she was playing on her own cellphone. While

---

[1] The suppression hearing was held before a magistrate judge, who issued a report and recommendation (R&R). On de novo review, the district court adopted the magistrate judge's findings of fact and conclusions of law. For ease in exposition, we take an institutional view and refer to those findings and conclusions as those of the district court.

on the defendant's cellphone, she elected to scroll through his photographs to find pictures of their pets that he had forwarded to her earlier that day. In the process, she encountered a photograph of the defendant's penis next to a pair of blurry hands. When she confronted the defendant about the photograph, he told her that it was old.

Still upset, Sánchez retrieved the defendant's cellphone later that night. In the recently deleted files, she found the same photograph. She also found a fourteen-second video of their six-year-old daughter masturbating the defendant. Enraged, she demanded that the defendant leave the house — but she kept his cellphone.

Sánchez proceeded to contact her uncle, a municipal police officer, so that he could explain the process for reporting what she had uncovered.[2] Following his advice, she repaired to the local police station. She told the desk officers what had transpired and, "out of anger and upset," decided to show them the blurry photograph and the video. Sánchez held the cellphone throughout the conversation, and the desk officers did not see anything besides the photograph and the video. Taken aback, the

_____

[2] There is no indication in the record that Sánchez's uncle was acting in a professional capacity. His advice was avuncular, not official.

desk officers arranged for Sánchez to meet with Puerto Rico Police Officer Aileen Pérez-Ramos (Officer Pérez) the following morning.

Sánchez and Officer Pérez met at the appointed time. Sánchez explained what had occurred overnight. On her own initiative, Sánchez pulled the cellphone out of her purse and, while holding it in her hand, played the video for Officer Pérez, who then instructed Sánchez to turn off the cellphone. Officer Pérez took the cellphone from Sánchez and asked her to return the next day for an interview at the district attorney's office.

The following day, Sánchez and Officer Pérez met with Agent Pedro Román (a representative of Immigration and Customs Enforcement). Officer Pérez gave the cellphone to Agent Román, and the three of them headed to the district attorney's office and met with a coterie of federal and local officials. Sánchez recounted the events of January 5. She then asked for the cellphone so that she could play the video. Agent Román passed the cellphone to Sánchez, who pulled up the video. With the cellphone in the hands of either Sánchez or Officer Pérez — there is conflicting testimony on this point — the assemblage watched the video. Agent Román then reclaimed the cellphone. As was true of her interview with Officer Pérez, Sánchez did not show the group anything other than the video.

Later the same day, federal agents (accompanied by Officer Pérez) interviewed the defendant at the police station.

After waiving his Miranda rights, see Miranda v. Arizona, 384 U.S. 436 (1966), the defendant admitted having recorded the video. At the conclusion of the interview, the defendant consented to a search of his cellphone.

In due course, a federal grand jury sitting in the District of Puerto Rico handed up a single-count indictment, which charged the defendant with production of child pornography. See 18 U.S.C. § 2251(b). The defendant moved to suppress the video and his ensuing confession on the ground that the officers transgressed the Fourth Amendment by accessing the video on his cellphone without a warrant and prior to obtaining his consent. The district court referred the motion to a magistrate judge, see 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(1), who held a two-day evidentiary hearing. The magistrate judge took the matter under advisement and subsequently issued the R&R, recommending that the district court deny the motion pursuant to the private search doctrine. See Rivera-Morales, 166 F. Supp. 3d at 168. The magistrate judge's rationale was that Sánchez searched the cellphone as a private party, and the officers' subsequent viewings of the video did not exceed the scope of her search. See id. Over the defendant's objection, the district court adopted the R&R and denied the motion to suppress.

Conceding his factual guilt but seeking to preserve his right to appeal the denial of his motion to suppress, the defendant

explored the possibility of entering a conditional plea. See Fed. R. Crim. P. 11(a)(2). The government withheld its consent, and the defendant instead proposed that he would waive his right to trial by jury. When the district court was about to convene the bench trial, the government stated that it intended to call witnesses to testify because the defendant had not stipulated to all of the relevant facts. In light of this development, the court continued the matter and decided to impanel a jury. Sánchez was the sole witness at the two-day jury trial, and her testimony was supplemented by a multipart factual stipulation. The defendant conceded his guilt in his opening statement and, not surprisingly, the jury returned a guilty verdict. With an eye toward sentencing, the district court ordered the preparation of the PSI Report.

In the PSI Report, the probation officer provided more lurid details about the defendant's sexual abuse of his daughter. On at least three occasions between September and December of 2014, the defendant told his daughter to touch his penis, which he called a "toy." He rubbed his penis against her vagina or anus multiple times and digitally penetrated her vagina at least once. The PSI Report also contained the probation officer's calculation of the defendant's guideline sentencing range (GSR). It recommended offense-level enhancements to account for the victim's age, see USSG §2G2.1(b)(1)(A), the commission of a sexual act, see USSG §2G2.1(b)(2)(A), the parent-child relationship, see USSG

§2G2.1(b)(5), and the pattern of activity involving prohibited sexual conduct, see USSG §4B1.5(b)(1).[3] The PSI Report suggested a two-level downward adjustment for acceptance of responsibility under USSG §3E1.1(a) but not the additional one-level reduction under USSG §3E1.1(b). The defendant objected to the proposed pattern-of-activity enhancement and requested the additional one-level discount for acceptance of responsibility.

At the disposition hearing, the district court sustained the defendant's objection to the pattern-of-activity enhancement. It denied his request for the third-level reduction for acceptance of responsibility under section 3E1.1(b), noting the extensive pretrial effort that the government had devoted to the case. This fine-tuning produced a GSR of 235 to 293 months. Emphasizing the tender age of the victim and her relationship to the defendant, the government sought a sentence of 360 months (the statutory maximum). The defendant sought a sentence of 180 months (the statutory minimum). The court imposed a 360-month term of immurement, explaining that the upward variance was warranted because the defendant had digitally penetrated the victim, his own

---

[3] All sentencing guideline references are to the 2016 Guidelines Manual, which was in effect at the time of the disposition hearing. See United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990) ("Barring any ex post facto problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.").

six-year-old daughter, and rubbed his penis against her vagina. This timely appeal followed.

## II. ANALYSIS

The defendant's claims of error fall into two buckets. First, he challenges the district court's denial of his motion to suppress. Second, he challenges his sentence as both procedurally flawed and substantively unreasonable. We address these challenges sequentially.

### A. <u>Suppression</u>.

The defendant's challenge to the denial of his motion to suppress rests on a claim that the district court misapplied the private search doctrine. He contends that the law enforcement officers who viewed the video on his cellphone lacked a virtual certainty that, while doing so, they would not come across additional (still-private) information. Without such a degree of certainty, the defendant's thesis runs, the officers' viewings of the video offended the Fourth Amendment. In grappling with this challenge, we assay the district court's findings of fact for clear error and its conclusions of law de novo. See <u>United States</u> v. <u>Hughes</u>, 640 F.3d 428, 434 (1st Cir. 2011).

We anchor our analysis in constitutional bedrock: the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

However, this prohibition only pretermits government action.  See Jacobsen, 466 U.S. at 113; United States v. Silva, 554 F.3d 13, 18 (1st Cir. 2009).  Thus, the Fourth Amendment is not implicated when a private party undertakes a search or seizure, regardless of the reasonableness vel non of her conduct, unless she is acting as a government agent.  See Jacobsen, 466 U.S. at 113; Silva, 554 F.3d at 18.

To determine whether a private party is acting as a government agent when conducting a search, we examine all of the attendant facts and circumstances.  See Silva, 554 F.3d at 18-19.  The case law teaches that three factors are especially relevant to this analysis:  "the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims primarily to help the government or to serve its own interests."  Id. at 18 (quoting United States v. Pervaz, 118 F.3d 1, 6 (1st Cir. 1997)).  That the government has an interest in the outcome does not, without more, convert an otherwise private search into state action.  See id.

In this case, Sánchez was plainly acting as a private party, not a government agent, when she accessed the defendant's cellphone at their marital domicile and discovered the video.  The defendant does not argue to the contrary and, at any rate, this conclusion is amply supported by the district court's factual

- 10 -

findings.  Sánchez first used the cellphone to unblock a game that she was playing and then decided to look for photographs of her pets.  She accessed the cellphone a second time because she was unhappy with the defendant's response when she confronted him about the blurry photograph.  In other words, her motives for handling the cellphone and accessing the photographs while at home were purely personal.  By the same token, the government did not instigate, participate in, or control Sánchez's examination of the contents of the cellphone on those occasions.  In fact, Sánchez had no communication with any government representative until after she had discovered the video.  Because Sánchez was acting in a private capacity, her use of the defendant's cellphone while at home and her consequent discovery of the video did not implicate the Fourth Amendment.  See id.

This leaves, of course, the instances in which Sánchez accessed the defendant's cellphone in order to show the video to various law enforcement officers.  Three such instances occurred before the defendant consented to a search of his cellphone: first, when Sánchez went to the police station and reported the video to the desk officers; second, when Sánchez repeated her story to Officer Pérez the following day; and third, when Sánchez met with several law enforcement officers at the district attorney's office. Although the parties' arguments lump these three incidents

- 11 -

together, we regard the first incident as analytically distinct —
and we start there.

We think it manifest that Sánchez was still acting as a
private party when she accessed the video to show it to the desk
officers. Even though Sánchez was advised to go to the police
station by her uncle (a municipal police officer), he was not
acting in an official capacity and did not accompany her on that
journey. Nor is there any evidence that he directed her to play
the video upon her arrival. For aught that appears, Sánchez sought
out the police on her own initiative in order to inform them about
her husband's illegal behavior and protect her daughter. When she
arrived at the station, she told the desk officers what she had
discovered and then, "out of anger and upset," showed them the
video. The desk officers did not touch the cellphone, which
remained in Sánchez's possession throughout her visit.

Nothing about this series of events indicates that the
government instigated, participated in, or controlled Sánchez's
accessing of the cellphone by, for example, asking her to pull up
the video. Nor does the record support an inference that Sánchez's
primary intent was to assist the government. To the contrary, she
displayed the video to the desk officers out of pique. Her motive
was purely personal, and although it may have overlapped with the
government's goal of combatting child pornography, this confluence
of interests did not, by itself, transmogrify Sánchez into a

government agent.  See United States v. Cameron, 699 F.3d 621, 638 (1st Cir. 2012).

To say more about this viewing would be to paint the lily.  Because Sánchez was not acting as a government agent when she accessed the video to show it to the desk officers, there is no plausible basis for concluding that those officers violated the Fourth Amendment.  Any other conclusion would contravene the settled principle that law enforcement officers are free to accept evidence voluntarily delivered to them by a private party — even evidence for which they would not have been able to search in the absence of a warrant — without crossing the line into forbidden Fourth Amendment territory.  See Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971); cf. Spencer v. Roche, 659 F.3d 142, 149 (1st Cir. 2011) (explaining that "a police officer's observation of an item in plain view does not constitute a search so long as the officer makes his observation from a lawful vantage point").

That ends this aspect of the matter.  Sánchez sought out the police on her own initiative in order to volunteer evidence of the defendant's misconduct.  During her conversation with the desk officers at the station — where the officers undoubtedly had a right to be — she accessed the video and played it for them.  In those circumstances, the officers cannot be said to have conducted a "search."  To paraphrase the Supreme Court, when Sánchez "of her own accord produced [the video] for inspection, rather than simply

describing [it], it was not incumbent on the police to stop her or avert their eyes." Coolidge, 403 U.S. at 489; see Jacobsen, 466 U.S. at 119-20 (explaining that officer's "viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment").

This holding does not get the government out of the woods. Law enforcement officers involved in the investigation reexamined the video on two subsequent occasions prior to obtaining the defendant's consent. On one occasion, Sánchez showed the video to Officer Pérez. On the other occasion, she showed it to a group of officers at the district attorney's office. In each instance, Sánchez — as part of an investigatory interview arranged by law enforcement personnel — played the video while describing what had occurred on the evening of January 5. For present purposes, these two reexaminations occurred under materially indistinguishable circumstances.[4] Consequently, we treat them together.

---

[4] The district court's factual findings reveal one potentially significant distinction between the two interviews. While Sánchez had custody of the cellphone until the end of the interview with Officer Pérez, Agent Román had custody of it throughout the interview at the district attorney's office (and Officer Pérez may have held it while the video was playing). Because the defendant does not contest that the government had lawful possession of the cellphone and only Sánchez accessed its contents, we agree with the district court that the officers' handling of the cellphone during the latter interview does not tip the Fourth Amendment balance. See Rivera-Morales, 166 F. Supp. 3d at 166 n.8.

- 14 -

Before embarking upon this joint treatment, we think it useful to narrow the circumference of the critical issue. To this end, we assume for argument's sake that Sánchez was acting as a government agent when she accessed and played the video during these interviews. We hasten to add that such an assumption does not, by itself, place the officers' warrantless reexaminations of the video in constitutional jeopardy. After all, not all intrusions into personal privacy attributable to the government are searches that implicate the Fourth Amendment. See Vega-Rodriguez v. P.R. Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997). Here, the government identifies one such intrusion — embodied in the private search doctrine — and argues that the reexaminations of the video fall squarely within the protections of that doctrine. The district court agreed, and we examine its ruling without further ado.

The private search doctrine rests on a solid doctrinal foundation. A government intrusion into personal privacy constitutes a Fourth Amendment search only when it offends an individual's reasonable expectation of privacy. See United States v. Hood, 920 F.3d 87, 90 (1st Cir. 2019); Vega-Rodriguez, 110 F.3d at 178. When a private party examines particular evidence and then invites the government to inspect what she has found, the private party has frustrated any reasonable expectation of privacy that an individual might have had in that evidence. See Jacobsen,

466 U.S. at 118-20, 120 n.17.  As a result, the government does not conduct a search when it does no more than examine particular evidence that a private party has already inspected and made available to it, even if that evidence once engendered a reasonable expectation of privacy.[5]  See id.; Powell, 925 F.3d at 5.

The legality of the government's actions in examining the evidence depends on the degree — if any — to which those actions "exceed[] the scope of the private search."  Jacobsen, 466 U.S. at 115.  In the classic case, the government does not perform a search if its examination of the evidence is "coextensive with the scope" of the antecedent private search and, viewed objectively, "there is 'a virtual certainty that nothing else of significance' could be revealed" through its actions.  Powell, 925 F.3d at 5 (quoting Jacobsen, 466 U.S. at 119); see United States v. D'Andrea, 648 F.3d 1, 9 & n.12 (1st Cir. 2011) (explaining objective nature of "virtual certainty" standard).  Conversely, when the government exceeds the scope of the private search, it

---

[5] Since the rationale for the private search doctrine derives from the existence vel non of an individual's reasonable expectation of privacy, one may wonder about the doctrine's continuing vitality in light of the Supreme Court's decision in United States v. Jones, 565 U.S. 400, 404-05 & 411 n.8 (2012) (holding that a physical intrusion into a constitutionally protected area for an investigatory purpose should be deemed to constitute a Fourth Amendment search).  Here, however, the defendant does not ask us to reconsider the private search doctrine in light of Jones, and we take no view on the issue.

conducts its own search, which requires independent Fourth Amendment justification. See Powell, 925 F.3d at 5.

In the case at hand, the critical question is whether the actions of the officers, in effectively accessing and viewing the video during the two reexaminations, fell within the scope of Sánchez's private search. The district court said that they did. See Rivera-Morales, 166 F. Supp. 3d at 168. It found that, during both interviews, Sánchez pulled up exactly the same video that she had discovered at home, showed that video — and nothing else — to the officers, and accessed no other material on the defendant's cellphone. See id. at 166. These findings are consistent with the record, and they show beyond any doubt that the government intrusions into the defendant's cellphone remained within the scope of Sánchez's private search. See Powell, 925 F.3d at 5-6 (finding no Fourth Amendment violation when government viewed without a warrant same screenshots that private party had seen and forwarded). In fact, the officers saw less than Sánchez did during her private search, as she went through a number of photographs on the cellphone as well.

This leaves, of course, the imbricated question of whether a reasonable officer would have been virtually certain that he would have seen on the cellphone only information previously observed by Sánchez. Neither the Supreme Court nor this court has set fixed parameters as to what constitutes "virtual

certainty" in this context. The term, though, implies something less than absolute confidence. This understanding of virtual certainty necessarily follows from the type of government intrusion authorized by the private search doctrine, which permits an officer to examine evidence that is not in plain view. See Jacobsen, 466 U.S. at 118-19, 120 n.17. Because the officer must rely exclusively on what the private searcher has reported, he can never be absolutely sure of what he will find. Police officers, after all, are not omniscient.

Seen in this light, we believe that the "virtual certainty" inquiry requires a common-sense determination into whether there is anything more than a remote or highly unlikely possibility that the officer's actions will uncover something of significance apart from what the private searcher has found and reported. In our view, anything more than a remote and highly unlikely possibility will dispel the aura of virtual certainty and, thus, prevent the officer from proceeding with his own warrantless examination of the evidence. Cf. United States v. Ackerman, 831 F.3d 1292, 1306 (10th Cir. 2016) (finding private search doctrine inapplicable when government actor "quite easily" could have come across previously unknown information); United States v. Lichtenberger, 786 F.3d 478, 488-89 (6th Cir. 2015) (same when "there was a very real possibility" that officer could have uncovered still-private information).

In this case, the "virtual certainty" requirement appears, at first glance, to be satisfied. Crucially, it was Sánchez — not one of the officers — who accessed the video during both interviews. Because she was familiar with the cellphone and knew where the video was stored, there was no credible risk that she would open applications or files other than the video that she intended to play. What is more, she had no incentive to show the officers anything other than the video that was the focal point of the interviews. Viewed objectively, the manner in which the officers reexamined the video ensured that there was no more than a remote possibility that the intrusions into the defendant's cellphone would disclose any data stored there beyond what Sánchez already had seen and reported.

In an effort to blunt the force of this reasoning, the defendant argues that the officers could not have been virtually certain that a notification — such as a calendar appointment or text message — would not spontaneously pop up on the cellphone's screen while they were watching the video.[6] This is strictly a

_____

[6] In articulating this argument, the defendant focuses solely on what the officers could have encountered when they viewed the video. Accordingly, he has waived any contention that the "virtual certainty" requirement was not satisfied because Sánchez could have come across pop-up notifications when she turned on the cellphone and accessed the video. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

- 19 -

theoretical argument:  nothing in the record suggests that such a notification actually appeared on the screen during either of the viewings.  We therefore have no occasion to address whether, had that happened, the Fourth Amendment would have permitted the government to use information gleaned from the notification in its prosecution of the defendant.  Instead, we limit our analysis to the particular species of "pop-up notification" argument that the defendant has actually made.

Before wrestling with this argument, we pause to place it in context.  After the suppression hearing, the defendant submitted a memorandum to the magistrate judge, in which he challenged the applicability of the private search doctrine to the officers' viewings of the video.  In that memorandum, he posited that the Supreme Court's decision in Riley v. California, 573 U.S. 373 (2014), required the officers to secure a warrant before accessing the contents of his cellphone.  Relatedly, he contended in general terms that the "virtual certainty" requirement was not satisfied because the magistrate judge could not be sure that the officers saw nothing on the cellphone but the video.  The defendant renewed those contentions — and only those contentions — in his objections to the R&R.  At no point during the proceedings below did he argue that, due to the possibility of pop-up notifications, the officers could not have been virtually certain that they would

see only the video.  On appeal, though, he tries for the first time to broach that argument.

Such "[h]opscotching from one theory to another theory has consequences."  United States v. Pinkham, 896 F.3d 133, 137 (1st Cir. 2018); cf. United States v. Dietz, 950 F.2d 50, 55 (1st Cir. 1991) (warning, in context of sentencing appeal, that defendant "cannot switch horses mid-stream in hopes of locating a swifter steed").  When a defendant changes his tune on appeal and advances before the court of appeals a theory different than the one that he advanced before the district court, the new theory is forfeited.  See Pinkham, 896 F.3d at 137.  That is the situation here:  careful perscrutation of the record reveals no indication that the defendant presented his "pop-up notification" argument face up and squarely in the court below.  Because review of forfeited theories is only for plain error, see United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001), we apply that stringent standard here.

To prevail on plain error review, an appellant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id.  The proponent of "plain error must carry the devoir of persuasion as to all four of these elements."  Pinkham, 896 F.3d at 136-37.

In this instance, we need not canvass all four elements of the plain error standard. For present purposes, it suffices to note that the defendant's forfeited argument stumbles on the second element. Although we readily acknowledge that the officers lacked absolute certainty that no pop-up notification would appear while they were viewing the video, "absolute certainty" is not the benchmark. Neither party offered a shred of evidence about the frequency with which pop-up notifications appear on cellphones and, in the absence of any such evidence, it is plausible to conclude that the possibility was remote and highly unlikely that a pop-up notification would appear while the officers were viewing the fourteen-second video. Moreover, the "virtual certainty" requirement aims to ensure that an antecedent private search does not become "a free pass for the government to rummage through a person's effects." D'Andrea, 648 F.3d at 9. It is far from obvious that the chance that a notification might have appeared on the screen afforded the officers any opportunity to rummage through the defendant's private information. And to cinch the matter, a criminal defendant generally cannot show that a legal error is clear or obvious in the absence of controlling precedent resolving the disputed issue in his favor. See, e.g., United States v. Delgado-Sánchez, 849 F.3d 1, 10-11 (1st Cir. 2017); United States v. Amaro-Santiago, 824 F.3d 154, 163 (1st Cir. 2016). Here, no

controlling precedent requires us to embrace the defendant's position.

The Jacobsen Court established the framework for the private search doctrine in the process of evaluating an officer's examination of a package. See 466 U.S. at 111. The Court did not define "virtual certainty," and it is not immediately apparent how that concept translates from the context of a static object like a package to the ever-changing screen on a cellphone. Our two prior opinions on the private search doctrine inch closer to the digital realm, see Powell, 925 F.3d at 5-6 (dealing with screenshots sent to government entity); D'Andrea, 648 F.3d at 6-10 (dealing with pictures stored on a website), but neither of them provides any direct guidance on how to think about virtual certainty vis-à-vis cellphones. On this undeveloped record, the lack of clarity in the case law dashes the defendant's hopes of demonstrating plain error.

A related point is worth making. Because most cellphones are able to display notifications spontaneously, the defendant is inviting us, in effect, to deem government inspections of information stored on a cellphone categorically exempt from the prophylaxis of the private search doctrine. It is neither clear nor obvious that we must accept this invitation. The only two courts of appeals that have addressed the private search doctrine in the cellphone context expressed no hesitance in permitting

tailored government inspections of information stored on such devices. See United States v. Suellentrop, 953 F.3d 1047, 1050 (8th Cir. 2020); United States v. Sparks, 806 F.3d 1323, 1334-36 (11th Cir. 2015).

The Supreme Court's decision in Riley does not demand a different result. There, the Court addressed the question of whether another Fourth Amendment doctrine — the search incident to arrest doctrine — permitted the warrantless inspection of digital information stored on a cellphone. See Riley, 573 U.S. at 385. To answer this question, the Court balanced the degree to which the search of the contents of a cellphone intrudes upon individual privacy against the extent to which such a search protects legitimate government interests in the context of an arrest. See id. at 385-86. The Court acknowledged that the search of the contents of a cellphone allows the government to access a significant amount of highly personal information. See id. at 386. On the other pan of the scale, the Court noted that such a search does not substantially advance the government interests that justify the search incident to arrest doctrine (the protection of officer safety and the safeguarding of evidence). See id. Balancing these considerations, the Court held that the government could not rely on the search incident to arrest doctrine to justify a warrantless search of information stored on an arrestee's cellphone. See id.

Although Riley suggests caution in applying the private search doctrine to cellphones and other types of digital devices, it does not either create or suggest a categorical rule to the effect that the government must always secure a warrant before accessing the contents of such a device. Cf. id. at 401-02 (stating that "case-specific exceptions may still justify a warrantless search of a particular phone"). As we explain below, we do not believe that Riley unequivocally requires that we exclude government inspections of evidence contained on cellphones from the private search doctrine.

To begin, it is not obvious that Riley's reasoning is directly applicable to the question before us. The Riley Court applied the balancing test that typically is used when deciding whether to exempt a particular type of search from the warrant requirement, see id. at 385 — yet a government inspection of evidence that falls within the ambit of the private search doctrine does not constitute a search in the first place, see Jacobsen, 466 U.S. at 117-20. Furthermore, the justification for the private search doctrine appears to apply with full force to digital information stored on a cellphone. When a private party conducts a search and then invites the government to examine what she has found, the government does not intrude on any reasonable expectation of privacy by accepting the invitation, regardless of where the evidence is located. See id. Last — but far from least

— allowing the government to inspect the contents of a cellphone under the private search doctrine does not necessarily risk the exposure of a significant quantity of personal information. If the government exceeds the scope of the antecedent private search and instead rummages through the cellphone, the private search doctrine will not protect its actions from the strictures of the Fourth Amendment. See Sparks, 806 F.3d at 1336 (holding that private search doctrine did not authorize officer to look at video on cellphone that private searcher had not previously seen); cf. Lichtenberger, 786 F.3d at 488-89 (finding Fourth Amendment violation when, after defendant's girlfriend found photographs on his laptop computer, she showed certain photographs to officer but could not say these were ones she had viewed earlier).

We summarize succinctly. Given the targeted manner in which the officers acted, it is neither clear nor obvious that the possible appearance of a pop-up notification on the defendant's cellphone was sufficient to dispel the officers' virtual certainty that they would see no other information of significance when they accessed and viewed the video. The defendant has, therefore, failed to show that the district court plainly erred in concluding that the "virtual certainty" requirement of the private search doctrine was satisfied with respect to the reexaminations of the video.

No more need be said. We hold that the desk officers' viewing of the video was not a Fourth Amendment search because they merely observed evidence that Sánchez, a private party, freely showed to them. We further hold that with respect to the two reexaminations of the video during the subsequent investigatory interviews, the district court supportably determined that the officers remained within the scope of Sánchez's antecedent private search. Nor did the district court plainly err in finding that there was a virtual certainty that the officers would see only information previously observed by Sánchez on the cellphone. Since the district court appropriately found that the officers did not violate the Fourth Amendment either by examining or by reexamining the video, we uphold its denial of the defendant's motion to suppress.[7]

## B. Sentencing.

We now train the lens of our inquiry on the defendant's challenges to his 360-month term of immurement. Appellate review of claims of sentencing error involves a two-step pavane. See United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013).

---

[7] Because we resolve the defendant's challenge to the denial of his motion to suppress under the private search doctrine, we have no occasion to address the government's alternative arguments that Sánchez had actual authority to consent to the officers' inspection of the defendant's cellphone or that, even if the officers violated the Fourth Amendment, the denial of the motion to suppress should be upheld under the inevitable discovery doctrine.

We first examine any assignments of procedural error. See id. If the sentence passes procedural muster, we next weigh any challenge to its substantive reasonableness. See id.

At both stages of the sentencing inquiry, we review preserved claims of error for abuse of discretion. See id. The abuse-of-discretion standard is not monolithic: within it, we review the sentencing court's findings of fact for clear error and questions of law (including the court's interpretation and application of the sentencing guidelines) de novo. See id.

1. **Claims of Procedural Error.** The defendant's first claim of procedural error concerns the district court's denial of the one-level downward adjustment for acceptance of responsibility under USSG §3E1.1(b). He argues that he was entitled to this adjustment because he admitted his culpability before he was charged and attempted to avert the necessity for a jury trial by proposing a conditional plea and (when that proved infeasible) by attempting to waive a jury.

To put this argument into perspective, we first describe the sentencing guidelines' two-tiered system to account for acceptance of responsibility. See United States v. Meléndez-Rivera, 782 F.3d 26, 29 (1st Cir. 2015). At the first tier, the defendant is entitled to a two-level downward adjustment in his offense level when the sentencing court determines that he has "clearly demonstrate[d] acceptance of responsibility for his

- 28 -

offense."  USSG §3E1.1(a).  If the defendant receives this adjustment and if his offense level (calculated without reference to the first-tier adjustment) is sixteen or more, the second tier becomes relevant.  See USSG §3E1.1(b).  That tier contemplates a further one-level discount

> upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.

Id.

At first blush, the language of both section 3E1.1(b) and the accompanying guideline commentary appears to make the additional one-level reduction contingent on the government's affirmative decision to file a motion.  See id.; see also id. cmt. n.6 ("Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) may only be granted upon a formal motion by the Government at the time of sentencing.").  But in practice, a district court retains some ability to grant the reduction even if the government abjures such a motion.  See Meléndez-Rivera, 782 F.3d at 30.  This ability is narrowly circumscribed:  a sentencing court may exercise it only "when the government's withholding of the predicate motion 'was

based on an unconstitutional motive' or 'was not rationally related to any legitimate government end.'" Id. (quoting United States v. Beatty, 538 F.3d 8, 14 (1st Cir. 2008)). Under Amendment 775 to the sentencing guidelines, which took effect on November 1, 2013, "[t]he government should not withhold such a motion based on interests not identified in §3E1.1, such as whether the defendant agrees to waive his or her right to appeal." USSG §3E1.1, cmt. n.6.

In the case at hand, the district court adopted (without objection by the government) the PSI Report's recommendation that the defendant receive a two-level downward adjustment under section 3E1.1(a). That adjustment is not in issue here. See id. cmt. n.2 (allowing adjustment when "a defendant goes to trial to assert and preserve issues that do not relate to factual guilt"). But the government refused to move for the additional one-level reduction under section 3E1.1(b). Its reasons were twofold: it had to expend appreciable resources responding to the suppression motion, and the defendant's insistence on a conditional plea forced it to prepare for trial. Notwithstanding the government's recalcitrance, the defendant persisted in his quest for the additional one-level discount. The court turned a deaf ear to this request.

The parties spar over the question of whether the district court appropriately credited the government's need to

respond to the defendant's suppression motion as a justification for its decision to withhold a section 3E1.1(b) motion. See United States v. Silva, 865 F.3d 238, 244-45 (5th Cir. 2017) (per curiam) (recognizing unsettled question as to whether section 3E1.1(b) permits denial of additional level for this reason after promulgation of Amendment 775). We need not plunge into these muddy waters, as the government cited its trial preparation as a further justification for its refusal to file the motion. Given this alternative justification, the district court did not abuse its discretion in denying the defendant's request for the additional one-level reduction. We explain briefly.

The defendant bore the burden of persuading the district court that the withholding of the predicate motion was either based on an unconstitutional motive or unrelated to a legitimate government end. See Beatty, 538 F.3d at 14-15; cf. United States v. Ocasio, 914 F.2d 330, 332 (1st Cir. 1990) ("A defendant has the burden of proving his entitlement to a downward adjustment in the offense level."). He makes no argument that the government's action was based on an unconstitutional motive. The question thus reduces to whether the defendant showed that the withholding of the motion was not rationally related to a legitimate government end.

The defendant has failed to carry this burden. The purpose of the section 3E1.1(b) discount is to reward a defendant

"for helping the authorities save resources . . . by a pre-trial plea of guilty," so it will only be available to a defendant who elects to stand trial in rare circumstances. United States v. Hines, 196 F.3d 270, 273-74 (1st Cir. 1999) (explaining that, absent agreement with government, defendant normally must notify authorities of willingness to enter unconditional guilty plea to receive section 3E1.1(b) discount); see USSG §3E1.1(b). As a corollary of this proposition, we think it obvious that the government may withhold a section 3E1.1(b) motion on the ground that it had to engage in trial preparation. See, e.g., United States v. Rayyan, 885 F.3d 436, 440-41 (6th Cir. 2018).

In this instance, the defendant chose not to plead guilty and elected to stand trial instead. Although the trial was brief and the defendant conceded his guilt, the government still had to expend resources to prepare. For example, the government filed proposed voir dire questions, proffered suggested jury instructions, prepared and delivered both an opening statement and summation, and presented the testimony of a witness (Sánchez). We discern nothing in the record that calls into question the government's statement that its decision to withhold a section 3E1.1(b) motion was based at least in part on its legitimate interest in avoiding this type of trial preparation. We conclude, therefore, that the defendant failed to show that the district

court had authority to award the additional one-level reduction in the absence of a government motion.

The defendant resists this conclusion. He points out that he endeavored to avoid a jury trial by seeking to enter a conditional plea (preserving his right to appeal the suppression order), see Fed. R. Crim. P. 11(a)(2), and — when that failed — by seeking to agree to a bench trial on stipulated facts. In the defendant's view, the government had to prepare for trial only because it spurned his offer of a conditional plea and then refused to go along with his proposed stipulation. And he adds that the denial of the additional one-level discount unfairly penalized him for exercising his right to seek suppression.

We recognize that the defendant's decision not to enter an unconditional guilty plea and his refusal to agree to the government's preferred stipulation were bound up with his desire to preserve his ability to appeal the denial of his nonfrivolous suppression motion. But just as a defendant has a right, within broad limits, to make strategic choices, so too the government has a right to make strategic choices of its own. Thus, the government was under no obligation to accept either the defendant's offer of a conditional plea or his preferred version of stipulated facts.

Here, moreover, the defendant offers no reason to believe that the government's strategic choices (such as its refusal to accept his conditional guilty plea on the terms that he

proffered) were either arbitrary or rooted in improper considerations. This is important because the parties' strategic decisions compelled the government to engage in trial preparation. Quintessentially, section 3E1.1(b) is meant to reward defendants who spare the government the expense of trial; and we conclude that the government could eschew the filing of a section 3E1.1(b) motion here on the ground that the defendant's strategic choices made a trial inevitable.

Last but not least, the denial of the additional one-level reduction did not improperly penalize the defendant for seeking to appeal the suppression order. His decision to preserve his appellate rights caused the government to expend resources on a jury trial. Although the government's ability to withhold a section 3E1.1(b) motion on that ground may disincentivize a defendant from choosing to stand trial, such a disincentive is not improper. See Beatty, 538 F.3d at 16. Having sown the wind (electing to stand trial to preserve his appellate rights in what he deemed the most advantageous fashion), the defendant had to know that he might reap the whirlwind (the risk of losing the additional one-level reduction for acceptance of responsibility). He cannot now be heard to complain that this predictable risk materialized. See id. at 16-17. For these reasons, we hold that the government rationally justified its decision not to file a section 3E1.1(b) motion on the basis of its trial preparation.

Thus, the district court did not abuse its discretion in denying the additional one-level reduction for acceptance of responsibility.

The defendant's second claim of procedural error posits that the district court did not adequately justify the extent of the upward variance that it imposed. According to the defendant, the court's reference to his sexual abuse of his daughter prior to the recording of the video did not sufficiently explain a variance of 67 months above the apex of the GSR. We review this claim of error for abuse of discretion. See United States v. Fernández-Cabrera, 625 F.3d 48, 53 (1st Cir. 2010).

We start with the baseline rule that a sentencing court has a statutory mandate to "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). Withal, this mandate does not mean that a court's explanation must "be precise to the point of pedantry." United States v. Sepúlveda-Hernández, 817 F.3d 30, 33 (1st Cir. 2016) (quoting United States v. Turbides-Leonardo, 468 F.3d 34, 40 (1st Cir. 2006)). Rather, we appraise the adequacy of a court's explanation "in a practical, common-sense way," asking whether it has identified the main factors driving the imposed sentence. Id. (quoting United States v. Dávila-González, 595 F.3d 42, 48 (1st Cir. 2010)). We recognize, though, that when a court imposes a variant sentence, it must furnish a somewhat more detailed justification,

commensurate with the extent of the variance.  See United States
v. Fields, 858 F.3d 24, 31 (1st Cir. 2017).

Here, the district court relied chiefly on the
seriousness of the offense, see 18 U.S.C. § 3553(a)(2)(A), to
justify the upward variance.  It thought the upward variance
appropriate "because of what [the defendant] did prior to this
particular incident," that is, digitally penetrating the victim
(his six-year-old daughter) and rubbing his penis on her vagina.[8]
Although the defendant seeks to characterize this explanation as
encompassing only the prior sexual abuse, we think it apparent
that the court was also concerned about the familial relationship
and the victim's age.  These factors plainly compounded the gravity
of the offense.

It is well-established that "[w]here the record permits
a reviewing court to identify both a discrete aspect of an
offender's conduct and a connection between that behavior and the
aims of sentencing, the sentence is sufficiently explained to pass
muster under section 3553(c)."  Sepúlveda-Hernández, 817 F.3d at
33 (alteration in original) (quoting Fernández-Cabrera, 625 F.3d

---

[8] The district court declined to apply the pattern-of-activity
enhancement under USSG §4B1.5(b)(1) based on this prior abuse, but
the defendant does not contest that this conduct was relevant under
section 3553(a) in determining his sentence.  See United States v.
Anonymous Defendant, 629 F.3d 68, 76 (1st Cir. 2010) (explaining
that "courts have long been permitted to consider more than charged
conduct in fashioning sentences," including "prior criminal
conduct that has not ripened into a conviction").

at 54). Though concise, the district court's explanation emphasized multiple aspects of the defendant's conduct that rendered it especially heinous. Because the court made pellucid that the seriousness of the offense was the driving force in its sentencing calculus, its explanation was sufficient to satisfy the statutory mandate.

The defendant attempts an end run, suggesting that the district court's explanation was inadequate because his total offense level already included offense-level enhancements for the age of the victim, his relationship with the victim, and the fact that the crime involved a sexual act. This suggestion has a patina of plausibility: we have held that "when a sentencing court relies on a factor already accounted for by the sentencing guidelines to impose a variant sentence, the court must indicate what makes that factor worthy of extra weight in the defendant's case." Fields, 858 F.3d at 32 (citing United States v. Zapete-Garcia, 447 F.3d 57, 60 (1st Cir. 2006)). Upon careful perscrutation, though, the defendant's premise collapses.

Although the defendant's total offense level included the enhancements that he identifies, the district court expressly declined to adopt a pattern-of-activity enhancement. See USSG §4B1.5(b)(1). It follows that the GSR did not take into account the multiple occasions that the defendant sexually abused his minor daughter. Put another way, the defendant's GSR would have been

the same had his misconduct been limited to the recording of the video. By invoking the uncharged sexual abuse of the victim, the court persuasively articulated why it believed that the defendant's case differed from the generic set of facts that fell within the heartland of the GSR. See United States v. Del Valle-Rodríguez, 761 F.3d 171, 177 (1st Cir. 2014).

The defendant proffers one last claim of procedural error. In his sentencing memorandum and at the disposition hearing, the defendant argued for a downwardly variant sentence of 180 months (the statutory minimum) in order to reflect his personal characteristics, reward his prompt acceptance of responsibility, and avoid sentencing disparities with purportedly similar offenders in the District of Puerto Rico. He assigns error to the district court's failure to spell out why it rejected these arguments.

We need not tarry. As a general matter, a sentencing court is under no obligation either to address every argument that a defendant advances in support of his preferred sentence or to walk through each of the section 3553(a) factors one by one. See United States v. Cortés-Medina, 819 F.3d 566, 571 (1st Cir. 2016). So, too, although a district court must adequately explain its sentence, it has "no corollary duty to explain why it eschewed other suggested sentences." United States v. Vega-Salgado, 769 F.3d 100, 103-04 (1st Cir. 2014). This makes good sense: the

sentencing court's rationale often can be discerned by comparing the parties' written and oral arguments with the court's explanation at sentencing. See United States v. Murphy-Cordero, 715 F.3d 398, 401 (1st Cir. 2013).

At the disposition hearing, the court below made clear that it had read the parties' sentencing memoranda and allowed both sides a final opportunity to argue for their preferred sentences. After calculating the defendant's GSR, the court represented that it had considered the section 3553(a) factors. "Such a statement is entitled to significant weight." United States v. Santiago-Rivera, 744 F.3d 229, 233 (1st Cir. 2014). The court then mentioned many of the personal characteristics that the defendant had highlighted in his request for a downward variance. And finally, after acknowledging the defendant's requested sentence of 180 months, the court explained that it was imposing an upward variance because of the defendant's prior sexual abuse of his six-year-old daughter. This chain of events gives rise to only one reasonable inference: that the court was aware of the defendant's arguments for a downward variance and found them wanting. The court was not obligated to justify its rejection of the defendant's entreaty for a downward variance in any greater detail.

Contrary to the defendant's importunings, our decision in United States v. Robles-Alvarez, 874 F.3d 46 (1st Cir. 2017),

does not demand a different result. There, the defendant sought a downward variance from his GSR of life imprisonment to align his sentence with the 46-month term of imprisonment imposed on the ringleader of the conspiracy that he had joined. See id. at 52-53. We found procedural error due to the court's failure to mention the defendant's "potentially forceful disparity argument," let alone explain why that argument lacked bite. Id. at 53.

The case at hand and Robles-Alvarez are not fair congeners. Here, the sentencing court explicitly acknowledged the defendant's request for a downward variance and — unlike in Robles-Alvarez — we cannot say that the defendant's disparity argument was "potentially forceful." We have emphasized that "[a] credible claim of sentencing disparity requires that the proponent furnish the court with enough relevant information to permit a determination that he and his proposed comparators are similarly situated." United States v. Rodríguez-Adorno, 852 F.3d 168, 177 (1st Cir. 2017). The defendant has not made such a showing. Although he calculated an average sentence of 204 months for producers of child pornography in the District of Puerto Rico since 2000, such offenses are infinitely varied. The record discloses that the defendant made no attempt to compare himself with these other offenders on any metric other than the charged offense.[9]

_____

[9] We say "charged" offense because the defendant's calculation appears to include the sentences of offenders who had their

Given this chasmal gap in his disparity argument, it is a compelling inference that the court declined to vary downward because it found the defendant was more culpable than the average producer of child pornography.

2. **Claim of Substantive Unreasonableness.** This brings us to the defendant's challenge to the substantive reasonableness of his sentence. Echoing one of his claims of procedural error, he contends that the district court fashioned his sentence without due consideration of certain mitigating factors (including his age, forthright acceptance of responsibility, and lack of prior criminal record). In light of these factors, he says that his 360-month term of immurement is indefensible. Inasmuch as the defendant preserved this claim of error below, our review is for abuse of discretion. See United States v. Matos-de-Jesús, 856 F.3d 174, 179 (1st Cir. 2017).

Reasonableness in the sentencing context "is a protean concept." United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011) (quoting United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008)). As a result, "[t]here is no one reasonable sentence in any given case but, rather, a universe of reasonable sentencing outcomes." Id. In appraising the substantive reasonableness of

_____

production counts dismissed as part of a plea negotiation. Such offenders are obviously not similarly situated to the defendant for the purpose of his sentencing disparity argument.

a particular sentence, then, our task is simply to determine whether the sentence falls within this broad universe. See United States v. de Jesús, 831 F.3d 39, 43 (1st Cir. 2016). When performing this task, we cannot substitute our judgment of the appropriate sentence for that of the sentencing court; to the contrary, we must accord significant deference to the court's informed determination that the section 3553(a) factors justify the sentence imposed. See Martin, 520 F.3d at 92. This approach does not change merely because the sentencing court opts to vary from the GSR. See Santiago-Rivera, 744 F.3d at 234. In the last analysis, a sentence is substantively reasonable so long as the sentencing court offers a plausible rationale and the sentence represents a defensible result. See United States v. Vargas-García, 794 F.3d 162, 167 (1st Cir. 2015).

Viewed against this backdrop, the defendant's sentence is unimpugnable. The district court's explanation for varying upward, though concise, contained a clear and coherent rationale: the victim was the defendant's own six-year-old daughter, and he sexually abused her on multiple occasions.

The defendant assails this rationale, arguing that it overlooks certain mitigating factors concerning his history and characteristics. This argument misses the mark. Mitigating factors cannot be viewed in a vacuum; and although a sentencing court must consider the full range of relevant factors, "the

- 42 -

weighting of those factors is largely within the court's informed discretion." Clogston, 662 F.3d at 593. To this end, we have admonished that a successful challenge to the substantive reasonableness of a sentence "must comprise more than a thinly disguised attempt by the defendant 'to substitute his judgment for that of the sentencing court.'" Vargas-García, 794 F.3d at 167 (quoting Clogston, 662 F.3d at 593).

Here, moreover, the district court expressly acknowledged many of the factors that the defendant asked it to consider, including his age, educational and work history, and lack of any prior criminal history or drug use. Notwithstanding these mitigating factors, the court determined that the seriousness of the offense justified a substantial upward variance. Viewed in the cold light of day, the defendant's real complaint is not that the court overlooked mitigating factors but, rather, that it did not assign those factors the weight that he thinks they deserve. Such thin forestation is insufficient to throw shade on the plausibility of the sentencing court's rationale. See Coombs, 857 F.3d at 452.

The district court coupled this plausible sentencing rationale with a defensible result. To be sure, the 360-month sentence — the statutory maximum for the offense of conviction, see 18 U.S.C. § 2251(e) — was severe, especially for a defendant who admitted his factual guilt from the start. But we do not

- 43 -

presume that a sentence is substantively unreasonable simply because it is severe. See Flores-Machicote, 706 F.3d at 25; United States v. Leahy, 668 F.3d 18, 24 (1st Cir. 2012). Acts ought to have consequences, and heinous acts ought to have severe consequences. A sentencing court has discretion, within wide margins, to impose an upward variance when it determines that the nature and circumstances of the offense, the need for condign punishment, and the other section 3553(a) factors warrant a stiff sentence. See Matos-de-Jesús, 856 F.3d at 180.

The court below did not write outside these wide margins in handing down a 360-month sentence. The defendant's conduct was reprehensible in the extreme: he told his six-year-old daughter that his penis was a "toy," had her masturbate him at least three times, and recorded a video of her doing so. To make matters worse, he rubbed his penis against her vagina or anus multiple times and digitally penetrated her vagina at least once. This sexual abuse will likely cause the victim irreparable mental anguish. Under these circumstances, the court reasonably determined that the defendant's aggravated conduct justified a substantial upward variance. On this sordid record, we cannot say that the sentence imposed falls outside the universe of reasonable sentencing outcomes. See de Jesús, 831 F.3d at 43.

- 44 -

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, the judgment of the district court is


**<u>Affirmed.</u>**